**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| JEREMY EWALD,<br><br>Plaintiff,<br><br>vs.<br><br>CHRISTOPHER CENTENO, CENTENO SCHULTZ, LLC, and REGENEXX, LLC,<br><br>Defendants, | ) | CIVIL ACTION FILE NO.:<br><br>Jury Trial Demanded |

# COMPLAINT

Plaintiff Jeremy Ewald ("Ewald"), by and through his undersigned counsel, states his Complaint against Defendants Christopher Centeno, M.D. ("Dr. Centeno"), Centeno Schultz, LLC a/k/a Regenexx Colorado a/k/a Centeno-Schultz Clinic (the "Centeno Clinic"), and Regenexx, LLC ("Regenexx") (collectively, "Defendants"), as follows:

## INTRODUCTION

1. Dr. Centeno co-founded and serves as the Chief Medical Officer of Regenexx, a provider of non-surgical options to treat orthopedic issues. Dr. Centeno is also the founder of the eponymous Centeno Clinic, which all Defendants market as the worldwide headquarters of Regenexx.

2. Ewald suffers from Craniocervical Instability ("CCI"), a debilitating condition—or, as Defendants put it, a "life-changing problem"—impacting the connection between the skull and spine. CCI is both difficult to diagnose and highly complicated to treat via surgery.

3. To treat his CCI, Ewald underwent Defendants' specialized Percutaneous Implantation of the CCJ Ligaments ("PICL") procedure—injection of the patient's own bone marrow into the damaged ligaments—on two occasions in 2024. For his part, Ewald has acknowledged positive results from his two procedures, as well as acknowledged continuing symptoms and complications. It did not "cure" him. The Centeno Clinic refers to its work as, for instance, the "Regenexx Procedures."

4. Owing to the debilitating pain and severe consequences on his life caused by his CCI condition, and the lack of clarity available to those who remain undiagnosed or cannot find safe and effective treatments, Ewald started an online community on Reddit for those impacted by CCI to share their experiences, findings, and support.

5. Because the PICL procedure was created by Dr. Centeno, and Defendants are the leading provider (of few) of the procedure in the world[1], much of the online discourse about CCI and the PICL procedure centers around Defendants.

6. While Defendants have had an ongoing study to assess the possible merit of the PICL procedure, its efficacy remains controversial, including because it may still be aptly termed experimental or (as Dr. Centeno puts it) "investigational," or in customary insurance parlance, "unproven." It has not been subject of peer-reviewed clinical study and its efficacy has purportedly been tracked only by Defendants' own internal data.

7. On his Reddit community, Ewald has taken issue with, e.g., Defendants' marketing materials terming the PICL procedure a "Craniocervical Instability Cure," and he filed a single anonymous complaint with the Colorado Department of Regulatory Agencies Division of Professions and Occupations regarding what he perceived to be deceptive marketing. He also addressed the discrepancy between Defendants' "cure" marketing and the investigational nature of the procedure on Reddit on December 2, 2025.

---

[1] It is Ewald's understanding that Defendants are the *only* current provider of the "PICL" procedure, but that a few others have tried to duplicate the procedure without calling it a "PICL."

8. To be sure, Ewald found his two PICL procedures to be helpful, but they were also no kind of "cure."

9. Defendants' response to Ewald's board complaint and related online speech was swift and severe. No later than the following morning, December 3, 2025, Dr. Centeno began writing to other individuals impacted by CCI—including those who may have been deceived by inaccurate "cure" marketing—for help in retaliating against Ewald (the "Retaliation Messages").[2]

10. For instance, Dr. Centeno—Ewald's own physician—sent the Retaliation Messages to other PICL patients on December 3, 2025, defaming Ewald by falsely accusing him of "orchestrating a number of anonymous board complaints" out of "a personal vendetta," preying upon the patients' fear about their condition and the possibility of the PICL procedure becoming unavailable as a result of Ewald's phantom anonymous complaints, and seeking "to put together a confidential patient group to source ideas and take action to counter these efforts" by Ewald.

11. Beginning a few hours later on December 3, 2025, Ewald began receiving threats to his personal and cyber security, his social media accounts were hacked, he was cyberattacked at work, he was defamed ad nauseum via

[2] One of the individuals was apparently offended by Defendants' call to action and provided the correspondence to Ewald.

republications of Defendants' own false and defamatory accusations, and he was otherwise generally harassed—by the same individuals that Defendants affirmatively sought out "to source ideas and take action" against Ewald.

12. For instance: an individual(s) who hacked one or more of Ewald's social media accounts messaged Ewald from the hacked account with a social security number (purporting to be Ewald's), stating "don't bark up the wrong tree"; Ewald's father received texts such as "Tell your son Jeremy to f[***] off … or we're gonna have issues"; an unauthorized individual(s) attempted to gain access to Ewald's professional email; and an unauthorized individual(s) spammed Ewald's newsletter email address until it ceased functioning.

13. Ewald not only experienced physical and cyber threats but was falsely defamed by many utilizing the same or similar language utilized by Defendants in their Retaliation Messages. In particular, Ewald's healthcare providers falsely accused Ewald of "filing and/or orchestrating a number of anonymous board complaints … against my Colorado medical license" out of a "personal vendetta" in an effort to "eliminate it [the PICL procedure] for all patients in the future." Dr. Centeno even referred to Ewald as "Crazy Jeremy" and falsely implied—as Ewald's physician with special access to Ewald's medical records—that Ewald suffers from mental and emotional disorders, stating he "has other [unspecified] issues…"

14. The through-line of Defendants' call to action to incite these acts against Ewald—but not publicly be seen as attacking their own patient—was to leverage their own patients' fear of CCI alongside false allegations that Ewald was out to hurt them by trying to take away the PICL procedure with a string of anonymous board complaints while simultaneously seeking to explain away the misleading "cure" marketing to those who may have been misled. Indeed, as a result, there were posts dedicated to, e.g., "To Admin: Don't take away our choice," and stating, e.g, "I have it on good authority regarding the CO medical board complaints. Its [sic] scaring the s[***] out of the PICL patient population including my 13 year old girl who spent the night crying hysterically."

15. To the extent Dr. Centeno or any other Defendant has been subject of "a number of anonymous board complaints" in any relevant or irrelevant period, they were not filed by or orchestrated by Ewald. Ewald filed precisely one anonymous board complaint principally to address an undisputed fact about Defendants' "cure" marketing—itself not claiming the procedure should be stopped or is inefficacious. Whether Defendants simply made-up a horde of anonymous board complaints aimed at "eliminat[ing]" the PICL procedure to motivate their worried patients to "take action" against Ewald to stop it or, alternatively, made up that they were filed or orchestrated by Ewald, is a topic for discovery.

16. Moreover, both the nature of Defendants' relationship to Ewald and Defendants' peculiar awareness of Ewald's existing condition and susceptibility to future harm rendered Defendants' actions wholly intolerable in a civilized society.

17. No person, much less the physician of a patient with a "life-changing problem" who the physician claims to have "other issues," should be permitted to behave in this fashion without consequences.

18. Accordingly, this is an action for, without limitation, (1) violations of the Computer Fraud and Abuse Act, (2) invasion of privacy via intrusion upon seclusion, (3) intentional infliction of emotional distress, (4) defamation, and (5) conspiracy to commit each of the above actions.

## PARTIES, JURISDICTION, AND VENUE

19. Plaintiff Ewald is a citizen of the state of Georgia, residing in this District.

20. Ewald is a salesman, publisher, and journalist.

21. Defendant Regenexx is a Delaware limited liability company registered to do business in Georgia that maintains multiple advertised locations in Georgia, including in this District. According to its filings with the Secretary of State, Regenexx's principal place of business is in Des Moines, Iowa. Regenexx may be

served with summons and process through its duly appointed registered agent, Registered Agents Inc., 8735 Dunwoody Place, Ste. R, Atlanta, GA 30350.

22. Defendant Dr. Centeno is, upon information and belief, a citizen and resident of the state of Colorado.

23. Defendant Centeno Clinic is a Colorado limited liability company with its principal place of business in Broomfield, Colorado. The Centeno Clinic may be served with summons and process through its duly appointed registered agent, Illumine Legal LLC, 8055 E Tufts Ave, Ste. 1350, Denver, CO 80237.

24. This matter arises, in part, under the laws of the United States, namely the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., and thus this Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

25. The Court has supplemental jurisdiction over Ewald's state law claims pursuant to 28 U.S.C. § 1367(a) because his state law claims are so factually related to his CFAA claim that it forms part of the same case or controversy under Article III of the United States Constitution.

26. Ewald is not presently certain of the identity of the members of the Centeno Clinic and Regenexx.

27. Upon information and belief, there exists complete diversity of citizenship between Ewald on the one hand, and Defendants on the other.

28. Upon information and belief, Dr. Centeno is a citizen of Colorado.

29. Upon information and belief, the Centeno Clinic is a citizen of Colorado.

30. Upon information and belief, Regenexx is a citizen of Iowa.

31. The amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

32. Regenexx is subject to general jurisdiction in this Court, including because it is registered to do business in Georgia.

33. Alternatively, this Court has personal jurisdiction over Regenexx pursuant to, without limitation, O.C.G.A. §§ 9-10-91(2)-(3).

34. Regenexx transacts significant business in Georgia, including through its advertised network locations in Atlanta, Alpharetta, and Columbus, Georgia.

35. Regenexx regularly does and solicits business in Georgia.

36. Regenexx engages in a persistent course of conduct in Georgia, through which it derives substantial revenue for services rendered in Georgia and to Georgia citizens.

37. Dr. Centeno and the Centeno Clinic also regularly solicit business from Georgia citizens, including Ewald.

38. All Defendants have publicly represented their intention to train other clinics to provide the PICL procedure, which presumably includes in the state of Georgia.

39. Defendants' conduct was knowingly directed at Ewald, a Georgia citizen.

40. Defendants additionally have myriad intangible contacts with Ewald and the state of Georgia, including through repeated harassing communications, hacking Ewald's accounts, and attempted hacking of Ewald's personal and professional networks (located in Georgia).

41. This matter arises, in part, from Defendants' Internet marketing materials, including to Georgia citizens, and solicitation of voluntary patients for Defendants' pending clinical trial, including from Georgia.

42. Sufficient contacts exist with respect to Defendants, their business, and the claims at issue in this case to satisfy the requirements of due process as to all Defendants.

43. As co-conspirators, all Defendants' conduct and forum contacts are imputed to one another for the purposes of jurisdiction analysis. *See, e.g., Rudo v. Stubbs*, 221 Ga. App. 702 (1996).

44. Because Defendants' conduct was directed toward Ewald, and because Regenexx is subject to the general jurisdiction of this Court, all Defendants are so subject to jurisdiction.

45. Jurisdiction over all Defendants comports with due process.

46. Alternatively, Defendants Dr. Centeno and Centeno Clinic are additionally subject to personal jurisdiction pursuant to O.C.G.A. § 9-10-91(2)-(3).

47. A substantial part of the events giving rise to Ewald's claims occurred in this District, where Ewald has lived for the past year. Defendants' speech and conduct was made about Ewald, his computers and social media accounts were maintained in and from Georgia, and he received harassing communications in Georgia.

48. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2)-(3).

## FACTUAL BACKGROUND

### Nature of Relationship

49. In 2023, Ewald formed a subreddit (the "Subreddit") for the purposes of discussing the CCI condition.

50. In 2024, Ewald received two PICL procedures, both performed by Dr. Centeno.

51. Throughout his and others' commentary on the Subreddit, Ewald participated in discussing, e.g., the PICL procedure, Defendants, and Defendants' marketing materials.

The Medical Board

52. In May 2025, Ewald filed a single anonymous complaint (the "May Anonymous Complaint") with the Colorado Division of Professions and Occupations, a Department of Regulatory Agencies (the "Medical Board").

53. The May Anonymous Complaint dealt principally with Defendants' "cure" marketing.

54. The May Anonymous Complaint is the only anonymous Medical Board complaint filed by Ewald.

55. In particular, Ewald felt it was unfair to those suffering from CCI for Defendants to market the PICL procedure as a "cure" rather than an "experimental," "investigational," or "unproven" procedure.

56. In December 2025, Ewald renewed his Medical Board complaint addressing Defendants' "cure" marketing—under his real name rather than a pseudonym and acknowledged to the Medical Board that the May Anonymous Complaint was his (the "December Board Complaint").

57. Ewald's December Board Complaint was also supplemented to address the Retaliation Messages after they came to light.

58. To Ewald's understanding, his December Board Complaint remains pending.

59. Ewald has not asked any person, or the Medical Board, to eliminate the PICL procedure.

60. Instead, Ewald has sought to ensure that Defendants fairly market their experimental, investigational, or unproven PICL procedure, and treat their patients fairly in the process.

61. Ewald's Medical Board complaint is aimed at protecting, not harming, those with the CCI condition.

62. Ewald does not seek to eliminate the PICL procedure via his Medical Board complaint.

63. Defendants have previously threatened Ewald for his filing of a Medical Board complaint, including that Defendants possess the right to sue Ewald for doing so.

Ewald's Subreddit Speech

64. On December 2, 2025, Ewald posted on the Subreddit regarding Defendants' "cure" marketing (the "December 2 Post").

65. The December 2 Post was titled "Is this unethical stem cell marketing? Am I wrong to call this out?"

66. The December 2 Post included screenshots of Defendants' "cure" marketing.

67. The December 2 Post acknowledged Defendants' ongoing trial studying the PICL procedure and addressed the lack of peer-reviewed or other commonly accepted data proving the procedure to be efficacious.

68. The December 2 Post was edited to acknowledge that Defendants changed their marketing shortly after the post.

69. Ewald was correct that Defendants publicly referred to the PICL procedure as a "cure."

70. In other words, Defendants know that the PICL procedure is not a "cure" and that marketing it as a "cure" is inappropriate.

71. In the Retaliation Messages, Defendants acknowledged that their marketing materials referred to the PICL procedure as a "cure" but blamed a website developer's metadata for the misleading marketing.

<u>Defendants' Retaliation Messages</u>

72. Defendants retaliated against Ewald for his petitioning conduct to the Medical Board.

73. On December 3, 2025, Dr. Centeno emailed multiple third parties regarding Ewald.

74. Dr. Centeno's Retaliation Messages were sent on behalf of himself, the Centeno Clinic, and Regenexx.

75. Dr. Centeno's Retaliation Messages were motivated by, among other things, the fact that Defendants did misleadingly market the PICL procedure as a "cure" (regardless of where they place the blame), that Defendants were likely concerned that their marketing was indeed unethical and could lead to severe consequences, and that Defendants derive significant revenue and repute from the PICL procedure.

76. Defendants were likely and understandably concerned that every patient they have ever treated with the PICL procedure may have a cause of action against them for their misleading "cure" marketing.

77. Defendants wanted to knock out two birds with one stone—shut down Ewald by communicating with the patients who might recognize their rights and sue Defendants for their misleading "cure" claim, while also leveraging their patients' fear of the CCI condition.

78. On December 3, 2025, Dr. Centeno messaged third parties as follows:

> I hope all is well. Recently, a patient who had a PICL and actually did quite well, but in my opinion has other issues, has taken it upon himself to try to

> attack the procedure in ways that may eliminate it for all patients in the future. Given that we have helped hundreds of patients avoid fusion and get on with their lives, I would like to *put together a confidential patient group to source ideas and take action to counter these efforts*. You are in no way obligated to do this, but I thought you may have an interest.
>
> Let me know if you would like to be part of that group.
>
> Dr. C

(Emphasis added).

79. On December 3, 2025, Dr. Centeno messaged third parties as follows:

> FYI. Based on the trends I'm observing, *I believe that Jeremy has been filing and/or orchestrating a number of anonymous medical board complaints about the PICL procedure* against my Colorado medical license. Thus far the board has dismissed *every one* that has been submitted. However, if I'm right, his "poll" on his sub will soon be submitted as *the most recent* medical board complaint.
>
> He will claim that because a web company we hired to maintain our website inserted metadata that patients can't see for the term "CCI Cure" that I am claiming that I can cure CCI. None of that will [be] true, in fact as soon as I saw that they inserted that metadata in the HTML, I asked them to remove it, they admitted that they had done it in error, apologized, and removed it. However, he will submit the complaint anyway. In other words, Jeremy is going *beyond just a personal vendetta*. Based on the nature of the *medical board complaints that he has submitted or orchestrated against me*, he is trying to eliminate the procedure. We'll know more in the next few weeks…
>
> If he does this, make sure that the patients in your circle know that if he gets lucky with *one of these complaints* and the board takes action, even on something trivial or minor, that *all physicians will be forced to stop offering the PICL procedure*, as it won't be worth the risk of losing or getting a mark on a medical license. In other words, if physicians believe that performing PICL could put their livelihood at risk or cause their insurance premiums to soar, all physicians will be forced to avoid it.

80. According to Defendants, they are the only, or one of few, providers of the PICL procedure anywhere in the world.

81. There was never any threat that "all physicians will be forced to stop offering the PICL procedure" as a result of Ewald's Medical Board complaint.

82. Defendants' concern was rooted in the earnings they expect to receive by virtue of their development of the PICL procedure, and the threat to their past earnings rooted in their misleading "cure" marketing.

83. Defendants' concern was also rooted in their concern that their reputation would be tarnished by their "cure" marketing.

84. Upon information and belief, Defendants—not some unspecified third party—were the providers of the PICL procedure who were concerned about its potential elimination by virtue of any Medical Board complaint filed against any Defendant.

85. Upon information and belief, Defendants—not some unspecified third party who did not claim the PICL procedure is a "cure"—were the providers of the PICL procedure who were concerned about the impact of Defendants' "cure" marketing.

86. As set forth below, Defendants manufactured claims to justify their call to action to retaliate against Ewald in their Retaliation Messages.

Resulting Harassment

87. As a result of Defendants' Retaliation Messages, Ewald suffered significant harassment.

88. When they sent their Retaliation Messages, Defendants intended that Ewald suffer significant harassment.

89. Defendants and their Retaliation Messages caused at least three of Ewald's social media accounts to be hacked.

90. Defendants and their Retaliation Messages caused personally identifying information regarding Ewald and/or his family to be posted on the Internet.

91. Defendants and their Retaliation Messages caused Ewald to be personally threatened.

92. Defendants and their Retaliation Messages caused Ewald's family to be threatened.

93. Defendants and their Retaliation Messages caused attempts to hack Ewald's professional e-mail domain.

94. Defendants and their Retaliation Messages caused Ewald's medical journalism e-mail domain to be spammed to the point that it ceased operating.

95. Defendants and their Retaliation Messages caused republications of Defendants' false accusations regarding Ewald.

96. Defendants knew, intended, and foresaw that their claims regarding Ewald in the Retaliation Messages would be republished by their recipients.

97. For instance, a recipient of the Retaliation Messages sent Ewald the following texts:




98. For instance, a recipient of the Retaliation Messages sent Ewald's father the following text:




99. Multiple recipients of the Retaliation Messages falsely defamed Ewald with the same claims made in the Retaliation Messages.

100. Recipients of the Retaliation Messages remained in regular contact with Defendants regarding how to attack Ewald.

101. For instance, one such person posted as follows:

Daniel Semrad
Admin 🏆 All-star contributor · 22h ·

Social "influencer" trying to shut down PICL

It has come to my attention that a certain self-styled social/medical "influencer" has been attempting to undermine and shut down the PICL procedure by submitting anonymous, frivolous complaints to the Colorado medical board. These complaints are not about treatment outcomes, his or anyone else's, but instead target things like website wording and other non-clinical details.

Unfortunately, the Colorado medical board is required to review every anonymous complaint, no matter how unfounded, and requires formal response from the physician. That means time, administrative burden, and legal costs for the physicians providing the procedure. So far, all of these complaints have been dismissed. But it only takes one reviewer having a bad day, or someone who believes surgery should be the only option, for an unwarranted action to jeopardize access to PICL for all of us who rely on it.

This individual is active on Reddit. Personally I don't go on Reddit precisely for reasons like this.

I'm not sure of the best way to address this situation, but if any group members are active on Reddit and feel comfortable doing so, it might help to calmly highlight the real-world harm these actions could cause for patients who rely on the PICL procedure.

For clarity, I have no vested interest here beyond being a patient like everyone else in this group. Neither I nor this group has any affiliation with Regenexx or the CSC. I can't speak to this individual's motivations, perhaps it may stem from his frustration after burning bridges that would have allowed him to pursue additional PICL treatments.

102. Defendants caused the recipients of the Retaliation Messages to further disseminate Defendants' request that Ewald be retaliated against for his petitioning conduct—again with the aim that Defendants not be seen as the orchestrator of the attacks.

103. As shown in Mr. Semrad's post above, he and Defendants were in active communication regarding the "sourced ideas" to "take action" against Ewald.

104. For instance, a recipient of Defendants' Retaliation Messages publicly posted: "oh you haven't heard? He's filing complaint after complaint with the CO medical board. Anonymously."

105. For instance, a recipient of Defendants' Retaliation Messages publicly posted: "Are you truly so petty that you're going after Dr Centeno's medical license and his practice and trying to shut down the PICL procedure because you have a personal problem with him????" and referred to him, e.g., as a "petty faggot."

106. For instance, a recipient of Defendants' Retaliation Messages publicly posted: "Seems this patient is almost stalking and trying to get back at Dr Centeno [sic]. They seen [sic] mentally unstable."

107. For instance, a recipient of Defendants' Retaliation Messages publicly posted: "yes, multiple anonymous complaints. He clearly has a vendetta."

108. For instance, a recipient of Defendants' Retaliation Messages publicly posted: "It's concerning that both your parents, Martin and Tammy, can't recognize your mental health struggles. You're also trying to report the clinic to the Colorado board, after Centeno denied you as a patient[.]"

109. For instance, a recipient of Defendants' Retaliation Messages publicly posted: "Also why don't you tell people on your subreddit you're making anonymous complaints to the board of Colorado on CSC Jeremy."

## Defendants' Fault for False Speech

110. Defendants knew at the time of publication[3] that Ewald had anonymously filed only the May Anonymous Complaint.

111. Upon information and belief, Defendants knew that Dr. Centeno had not been subject of multiple anonymous Medical Board complaints.

112. Upon information and belief, Defendants knew that no Defendant was subject of multiple anonymous Medical Board complaints.

113. Upon information and belief, Defendants knew that, irrespective of whether any Defendant was subject of multiple anonymous Medical Board complaints, such complaints were not filed by Ewald.

114. Upon information and belief, Defendants knew that, irrespective of whether any Defendant was subject of multiple anonymous Medical Board complaints, such complaints were not orchestrated by Ewald.

115. Upon information and belief, Defendants knew that no Medical Board complaint had been filed by Ewald asking or seeking that the PICL procedure be prohibited (or eliminated).

[3] All allegations made herein concern the specific point in time of Defendants' Retaliation Messages and related false and defamatory speech concerning Ewald.

116. Upon information and belief, Defendants knew that no other provider of the PICL procedure was concerned by Ewald's May Anonymous Board Complaint, including because Defendants advertise themselves as the creator and only provider of the PICL procedure.

117. Upon information and belief, because there were not multiple anonymous Medical Board complaints pending against Defendants, Defendants knew that the Medical Board had not dismissed multiple anonymous complaints against them, whether seeking the elimination of the PICL procedure or otherwise.

118. Defendants knew and intended that their false claims regarding Ewald would be foreseeably republished by others, including the recipients of the Retaliation Messages.

<u>Defendants' Conspiracy to Harm Ewald</u>

119. On, at least, December 3, 2025, Defendants openly solicited third parties to "source ideas and take action" against Ewald.

120. Defendants' Retaliation Messages were, on their face, in response to a complaint(s) to the Medical Board.

121. Defendants have previously denied the existence of the Retaliation Messages, or, at least, that "Regenexx and Dr. Centeno have in no way, shape, or

fashion participated in, encouraged, solicited, incited, or desired any harassment or improper conduct toward [Ewald], whether directly or indirectly."

122. Defendants' call-to-action in the Retaliation Messages was not limited to speech on the Internet.

123. Defendants knew and intended that the recipients of their Retaliation Messages would "take action" against Ewald.

124. The recipients of Defendants' Retaliation Messages did take action against Ewald, including as described herein.

125. Defendants reached an explicit and implicit agreement to "take action" against Ewald with the individuals who hacked, threatened, defamed, and otherwise harassed Ewald.

126. The purpose of Defendants' agreement with these third parties was, in part, to retaliate against Ewald for his First Amendment conduct and to dissuade him from continuing to engage in his First Amendment conduct.

127. That purpose included Defendants' desire not to be sued for their misleading "cure" marketing while their clinical study unfolded, hence Defendants' blaming their marketing on a website developer and to whom the Retaliation Messages were directed.

128. Defendants, having already publicly commented on Ewald, knew that responsive commentary alone would not dissuade Ewald from persisting in his petitioning and speech conduct.

129. In order not to be publicly seen as attacking their own patient, Defendants solicited third parties to do their bidding for them.

130. Clarifying the connection between Defendants' incomplete clinical study and their "cure" marketing, Defendants publicly blamed Ewald's conduct for their delay in completing their study regarding the efficacy of the PICL procedure.

131. Defendants have publicly blamed Ewald's conduct for their delay in publishing any findings from their study regarding the efficacy of the PICL procedure.

132. For instance:


Daniel Semrad · 32w
Thank you everyone for your comments and for offering to submit a positive experience with PICL to the Colorado medical board. I didn't want us to inadvertently complicate the situation, so I checked with Dr. C about that idea. He felt that doing so could draw unwanted attention to the issue, so it's best not to proceed with that and instead focus on calmly correcting the false claims on Reddit.

For your awareness: the complaints were filed anonymously or under the name "Claus Eiffen" with the phone number 555-555-5555. The most recent complaint focused on the same topic Jeremy was pushing on Reddit, so there is little doubt he's connected to these filings.

Dr. C also mentioned that he has been working to get the PICL paper published, and one of the major reasons for the delay has been these complaints and the significant amount of time they have required from him.

133. In fact, Dr. Centeno has claimed that Ewald's conduct has cost him more than 100 hours of time, which he otherwise would have devoted to completing his research.

134. Defendants' Retaliation Messages were additionally motivated, in part, from their apparent concern that the PICL procedure will not prove to be a "cure."

Demand for Retraction

135. In June 2026, Ewald delivered to Defendants a written demand for retraction of their false and defamatory statements regarding Ewald.

136. In July 2026, all Defendants refused to issue a retraction.

137. Regenexx not only refused a retraction to assist in protecting its patient from its founder's and CMO's and Director's speech—it threatened to sue its patient for simply bringing this litigation.

138. Despite refusing a retraction, no Defendant has asserted that any Defendant was actually subject of multiple Medical Board complaints, anonymous or otherwise, or seeking to eliminate the PICL procedure or otherwise.

Agency Liability

139. Regenexx is liable for Dr. Centeno's conduct because he is its co-founder, CMO, direct or indirect owner, and Director.

140. The Centeno Clinic is liable for Dr. Centeno's conduct because he is its co-founder, direct or indirect owner, and openly named physician.

141. Regenexx and the Centeno Clinic are liable for Dr. Centeno's conduct because, as the face of both, Dr. Centeno is synonymous with both.

142. Regenexx and the Centeno Clinic are liable for Dr. Centeno's conduct because he defamed Ewald and sent the Retaliation Messages in furtherance of their business, including to preserve their reputation, their existing financial standing, and their future revenues.

143. All Defendants market Dr. Centeno as the founder and face of Regenexx and the Centeno Clinic.

144. All Defendants market the Centeno Clinic as the worldwide headquarters of Regenexx.

145. Regenexx is the sponsor of Defendants' clinical study.

146. Dr. Centeno and the Centeno Clinic perform Defendants' PICL study, including on behalf of all Defendants.

147. The study forms a material part of the parties' dispute, including because it relates to Defendants' "cure" marketing and Ewald's Medical Board complaint that ultimately resulted in the Retaliation Messages.

148. Dr. Centeno's conduct toward Ewald as described herein was undertaken on behalf of all Defendants.

149. Dr. Centeno was acting within the scope of his agency for Regenexx and the Centeno Clinic, including to protect their joint clinical study, legal rights or defenses, future medical services, and future revenue streams, including from the state of Georgia, when he defamed Ewald and sent the Retaliation Messages.

**COUNT ONE**
**CONSPIRACY TO VIOLATE THE CFAA**

150. Ewald incorporates by reference paragraphs 1 through 149 of this Complaint as though set forth herein in their entirety.

151. The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), prohibits accessing any information from a protected computer without authority.

152. Any person who conspires to commit an offense under 18 U.S.C. 1030(a)(2)(C) is also liable for violations of the CFAA. *See* 18 U.S.C. § 1030(b).

153. Beginning on December 3, 2025, and continuing thereafter, Defendants, including through their Retaliation Messages, caused Ewald's social media accounts to be hacked and repeated unauthorized attempts to hack into Ewald's e-mail domain(s) to be made.

154. The hacker(s) and attempted hacker(s) were Defendants' co-conspirators and acting within the scope of their conspiracy to attack Ewald.

155. Defendants' conspiracy utilized unlawful means—among other things, violations of the CFAA—to accomplish unlawful objectives.

156. Neither Defendants nor their co-conspirators had authorization to access Ewald's computer(s), Internet accounts, or other protected information.

157. A "computer" includes any high-speed data processing device as well as "any data storage facility or communications facility … operating in conjunction with such a device."

158. A "protected computer" includes any computer used in or affecting interstate or foreign commerce or communication.

159. Ewald's personal and work computers, as well as his social media and e-mail accounts, constitute "protected computers."

160. Ewald's personal and work computers, as well as his accounts utilized with each, specifically including his social media accounts, are used in and otherwise affect interstate commerce and/or communication.

161. Defendants, including through their Retaliation Messages, converted Ewald's social media accounts and thereby withheld his access and passwords to the accounts' associated servers.

162. Defendants, including through their Retaliation Messages, not only accessed Ewald's social media accounts generally but also accessed information

stored therein, including Ewald's direct messages otherwise unavailable to the public.

163. Defendants, including through their Retaliation Messages, caused threatening messages to be directed at Ewald regarding both his physical and electronic security.

164. For instance, and without limitation, the following social media communication: "I'd also recommend securing your accounts in the future with 2 step auth's [authorizations]. If you'd like to go down this path I'll be more than happy to expose you for [who] you really are my friend. Take care of yourself."

165. Through their violations of the CFAA, Defendants caused Ewald damage within the meaning of the Act, including by causing his social media accounts and work e-mail to become unavailable to Ewald.

166. As a result of Defendants' conduct, Ewald took at least one week off from work.

167. The economic damages caused to Ewald from Defendants' violations of the CFAA, including in the form of attorney's fees and expenses to investigate the CFAA violations and resulting time off of work, exceed $5,000.00 in value.

168. As a direct and proximate result of Defendants' misconduct and conspiracy, Ewald has suffered damages in an amount to be proven at trial.

**COUNT TWO**
**INTRUSION UPON SECLUSION & CONSPIRACY**

169. Ewald incorporates by reference paragraphs 1 through 149 of this Complaint as though set forth herein in their entirety.

170. Ewald maintained a reasonable expectation of privacy in his computers and online accounts connected thereto.

171. Defendants, including through their co-conspirators, unreasonably intruded upon Ewald's privacy and solitude by hacking his social media accounts and attempting to hack his work e-mail.

172. Defendants, including through their Retaliation Messages, caused the hacking, attempted hacking, defamation, and harassment of Ewald, all of which was within the scope of their conspiracy to attack Ewald.

173. Defendants' conspiracy utilized unlawful means to accomplish unlawful objectives.

174. Defendants' conduct was highly offensive to Ewald and would be highly offensive to a reasonable person.

175. Defendants' invasion of Ewald's privacy caused Ewald to suffer emotional and mental distress in an amount to be proven at trial.

176. Ewald is further entitled to recovery of his attorneys' fees and costs of litigation from Defendants for their intentional misconduct, which evidences that

species of bad faith and stubborn litigiousness to justify such an award under Georgia law, including O.C.G.A. § 13-6-11.

177. Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences so as to entitle Ewald to an award of punitive damages in accordance with O.C.G.A. § 51-12-5.1.

**COUNT THREE**
**INTENTIONAL INFLICTION OF**
**EMOTIONAL DISTRESS & CONSPIRACY**

178. Ewald incorporates by reference paragraphs 1 through 149 of this Complaint as though set forth herein in their entirety.

179. Aside from Defendants' own defamatory speech, their Retaliation Messages were intended to, and did, result in severe distress to Ewald.

180. Other individuals—who hacked, attempted to hack, threatened, and defamed Ewald—were recipients of Defendants' Retaliation Messages and were Defendants' co-conspirators acting within the scope of their conspiracy to attack Ewald.

181. Defendants' conspiracy utilized unlawful means to accomplish unlawful objectives.

182. Defendants were specifically and acutely aware that Ewald was especially vulnerable to harm and the infliction of distress.

183. Defendants, as Ewald's physician and healthcare providers, were in a special relationship with Ewald, including having access to confidential information regarding his debilitating CCI condition.

184. In that context, acting in concert and pursuant to their conspiracy with others, Defendants subjected Ewald to emotional and mental distress by, without limitation, repeated instances of defamation, threats to Ewald's physical and cyber security, hacking of his social media accounts, attempted hacking of his work e-mail, spamming the e-mail he utilizes for his journalistic endeavors, posting his family's names and photographs, publicly posting a social security number intended to be Ewald's, and generally engaging in a sustained course of harassing conduct.

185. Defendants' conduct was intentional and reckless.

186. Defendants' actions were callous, extreme, outrageous, and not to be tolerated in a civilized society.

187. Defendants knew or disregarded a high probability that the totality of their conduct would cause Ewald severe emotional and mental distress.

188. Defendants were aware, and were in a special position to ascertain, that Ewald was already suffering from emotional and physical distress as a result of his CCI condition, and that he was therefore particularly susceptible to continuing harm.

189. Defendants' intentional and/or reckless conduct proximately caused Ewald to suffer severe emotional and mental distress in an amount to be proven at trial.

190. Ewald is further entitled to recovery of his attorneys' fees and costs of litigation from Defendants for their intentional misconduct, which evidences that species of bad faith and stubborn litigiousness to justify such an award under Georgia law, including O.C.G.A. § 13-6-11.

191. Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences so as to entitle Ewald to an award of punitive damages in accordance with O.C.G.A. § 51-12-5.1.

## COUNT FOUR
## DEFAMATION & CONSPIRACY

192. Ewald incorporates by reference paragraphs 1 through 149 of this Complaint as though set forth herein in their entirety.

193. On or about December 3, 2025, Defendants published to third parties the following false and defamatory accusations:

a. "Based on the trends I'm observing, I believe that Jeremy has been filing and/or orchestrating a number of anonymous medical board complaints about the PICL procedure against my Colorado license."

b. Ewald's board complaint regarding the "cure" marketing will be "[un]true" and "Jeremy is going beyond just a personal vendetta. Based on the nature of the medical board complaints that he has submitted or orchestrated against me, he is trying to eliminate the procedure."

c. "If he does this, make sure that the patients in your circle know that if he gets lucky with one of these complaints," i.e., again accusing Ewald of serially filing or orchestrating anonymous board complaints.

d. "Recently, a patient who had a PICL and actually did quite well, but in my opinion has other issues, has taken it upon himself to try to attack the procedure in ways that may eliminate it for all patients in the future."

194. The above statements are herein after referred to as the "Defamatory Statements."

195. In the full context in which they were made, the Defamatory Statements conveyed the false and defamatory meaning that Ewald personally filed and otherwise orchestrated numerous false complaints to the Medical Board, including out of a vendetta rather than legitimate concern.

196. The Defamatory Statements are each of and concerning Ewald.

197. Defendants published the Defamatory Statements without privilege.

198. Defendants published the Defamatory Statements negligently and with actual malice, in that they knew or recklessly disregarded that Ewald did not file or cause to be filed numerous anonymous board complaints.

199. Defendants published the Defamatory Statements negligently and with actual malice, in that they knew or recklessly disregarded that Ewald was not trying to eliminate the PICL procedure.

200. Defendants published the Defamatory Statements negligently and with actual malice, in that they knew there was no trend of anonymous medical board complaints being filed against any Defendant, including in regard to eliminating the PICL procedure.

201. Defendants published the Defamatory Statements negligently and with actual malice because, even if a trend of anonymous complaints attacking the PICL procedure had occurred, Defendants had no reasonable basis on which to accuse Ewald of filing or orchestrating them.

202. Defendants published the Defamatory Statements negligently and with actual malice, in that they knew Ewald's assertion that they utilized "cure" marketing language was true.

203. As additional indicia of Defendants' negligence and actual malice, Defendants formed a pre-conceived, false narrative to accomplish their malicious intent—to silence Ewald and thereby dissuade him from continuing to engage in his petitioning and speech conduct.

204. As additional indicia of Defendants' negligence and actual malice, Defendants formed a pre-conceived, false narrative to protect their reputation, existing financial standing, and future financial standing.

205. As additional indicia of Defendants' negligence and actual malice, Defendants harbored ill-will and ill-intent toward Ewald.

206. The Defamatory Statements are false.

207. Ewald did not file multiple, or, e.g., "a number of" anonymous board complaints against Dr. Centeno or any other Defendant.

208. Ewald filed only the May Anonymous Complaint, which he renewed via his December Board Complaint.

209. The Defamatory Statements are defamatory per se, in that they accuse Ewald of dishonesty, immorality, committing criminal conduct, and otherwise disparage him within his trade—as a salesman and journalist.

210. Indeed, Ewald not only created and administers his Subreddit but publishes a regular newsletter to a large audience in the medical community.

211. Because the Defamatory Statements are defamatory per se, damages to Ewald are presumed as a matter of law.

212. The Defamatory Statements proximately caused actual reputational, emotional, and mental damages to Ewald.

213. Defendants knew, intended, and foresaw that their Defamatory Statements would be republished by others, including the recipients of their Retaliation Messages.

214. Defendants knew, intended, and foresaw that their Defamatory Statements would result in harassment of Ewald.

215. Irrespective of Defendants' conspiracy with others to defame Ewald, they are liable for intended and/or foreseeable republications of the Defamatory Statements.

216. Irrespective of Defendants' conspiracy with others to defame Ewald, Defendants are liable for the natural and probable consequences of their Defamatory Statements.

217. Defendants engaged in a conspiracy with others—as evidenced by the Retaliation Messages—to attack Ewald, including through false and defamatory speech.

218. Many third parties, including the recipients of the Retaliation Messages, republished Defendants' Defamatory Statements in substantially the same form as stated in the Retaliation Messages.

219. The republication by others of Defendants' Defamatory Statements was made in furtherance of the conspiracy and within the scope of the conspiracy.

220. As a result of the evidence of Defendants' intent to harm, Ewald is entitled to an award of punitive damages to punish and deter Defendants from their unlawful conduct.

221. Defendants' actions were further taken in bad faith and they have otherwise been stubbornly litigious, and Ewald is therefore entitled to an award of his reasonable attorneys' fees and costs pursuant to O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Jeremy Ewald respectfully petitions this Honorable Court for the following relief:

a) That Summons and Process issue as provided by law;

b) That Ewald be granted a trial before a jury of his peers;

c) That Ewald be granted judgment and all appropriate damages, including compensatory damages in excess of $75,000.00, against Defendants;

d) That Ewald be granted an award of attorneys' fees and costs pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial;

e) That Ewald be granted an award of punitive damages in an amount to be proven at trial; and

f) For such other and further relief as the Court may deem just and proper.

Respectfully submitted this 24th day of July, 2026.

**WADE, GRUNBERG & WILSON, LLC**

/s/ G. Taylor Wilson
G. Taylor Wilson
GA Bar No. 460781
twilson@wgwlawfirm.com

3100 Cumberland Blvd. SE, Ste. 1130
Atlanta, Georgia 30339
404-600-1153
470-970-4303 (fax)

*Counsel for Plaintiff Jeremy Ewald*

**CERTIFICATION UNDER L.R. 7.1D.**

Pursuant to Northern District of Georgia Civil Local Rule 7.1D, the undersigned counsel certifies that this COMPLAINT is a computer document and was prepared in Times New Roman 14 point font, as mandated in Local Rule 5.1C.

This 24th day of July, 2026.

/s/ G. Taylor Wilson
G. Taylor Wilson